## FREMONT, ELKHORN & MISSOURI VALLEY RAILROAD COMPANY v. ALLEN ROOT.

FILED DECEMBER 16, 1896. No. 6734.

1. **Review:** ASSIGNMENTS OF ERROR. An assignment, "Errors of law occurring at the trial and duly excepted to at the time," is sufficient in a motion for new trial to raise a question of error in either the admission or exclusion of evidence by the trial court, but is not sufficient in a petition in error to present such questions to this court for review. In the latter the assignment must be specific and particularly designate the evidence in regard to which it is complained the error occurred.

2. **Carriers:** INJURY TO PASSENGER: PROXIMATE CAUSE. The contract between a railroad company, as a carrier, and a passenger, does not contemplate that the passenger shall go into the express car of the train; and if he go there, and while there is injured, if his going or being in such car entered into the injury, as an element thereof, as its proximate cause or rendering its reception more liable to occur, it would be a matter of defense for the carrier; but if not the proximate cause of the injury, or the risk of such particular injury was not increased by the action of the passenger, then that he assumed the position in the express car voluntarily would be no defense to an action for damages resultant from the injury.

3. ———: ———: QUESTION FOR JURY. Whether the party injured had, at the time, ceased to be a passenger of the defendant company, *held*, under the evidence adduced, to be a question of fact for the determination of the jury.

4. ———: ———: DAMAGES. *Held*, That under the allegations of the petition herein a recovery might be had for any injuries proved to have been sustained by the party plaintiff in the character of a

passenger, as a licensee on the company's premises, or as a tres-passer thereon.

5. ———: ———: NEGLIGENCE OF CONDUCTOR. The injuries complained of were claimed to have resulted from direct acts of the conductor. *Held*, That there was sufficient evidence to sustain a finding that the conductor was, at the time, acting for the company and within the line of his duties.

6. Instructions: ASSIGNMENTS OF ERROR. Where alleged errors in regard to the giving of instructions are assigned in group in the motion for a new trial, and any instruction of the group is determined to be without error, the alleged errors need not be further examined.

7. ———: REVIEW. When it is apparent that an instruction, if read and construed with others of the charge on the same subject or branch of the case, is pertinent and not calculated to confuse or mislead the jury, its giving was not erroneous.

8. Damages: INTEREST. Where the rendition of judgment on a verdict for the plaintiff in an action of contract or tort is delayed during the pendency of a motion for a new trial on behalf of defendant, it is not error to render judgment for the amount of the verdict and interest from its date to the date of rendition of judgment.

9. Personal Injuries: JUDGMENT FOR DAMAGES. The evidence *held* sufficient to support the verdict.

ERROR from the district court of Holt county. Tried below before BARTOW, J.

*William B. Sterling* and *B. T. White,* for plaintiff in error.

*M. F. Harrington* and *E. W. Adams, contra.*

HARRISON, J.

This action was commenced in the district court of Holt county to recover of the defendant company the damages for personal injuries alleged to have been sustained by plaintiff at Emmet, a station on the line of railway of defendant company. The petition contained allegations that the defendant company was a corporation and a common carrier, and, as such, operating a line of railroad from Blair to Emmet, Nebraska; "that on the 25th day of March, 1886, the plaintiff purchased from the defendant a ticket entitling him to a safe pas-

sage over said defendant's road from Blair, in Nebraska, to Emmet, in Holt county, Nebraska, and thereupon, at said Blair, entered and became a passenger on the cars of said defendant on its said railroad; * * * that said plaintiff, on his said ticket, was conveyed by said defendant on its train of cars run on said road from said Blair to said Emmet; that on account of the gross negligence and willful carelessness of said defendant, the said defendant did not stop its train, on board of which this plaintiff was as aforesaid stated, at said Emmet station for a longer time than ten seconds and not a sufficient length of time for said plaintiff to get off said cars safely, at which place said plaintiff intended to leave said cars; that at said Emmet said plaintiff was about to get off, and endeavoring to get off the car of said train on which he then was, in a careful and reasonable manner, and before this plaintiff had got off of said car, said train was, by the employes of defendant operating said train, started up, and plaintiff then carefully and reasonably attempted to get fully back into said car, whereupon plaintiff was seized by the defendant's agent, to-wit, its conductor of said train, and plaintiff was by said defendant's said agent, wrongfully, unlawfully, negligently, and in a rough and violent manner, pulled off said car and thrown down upon the ground a distance of six feet while said train was in motion, at a speed of five miles an hour, by reason whereof said plaintiff was greatly injured, in that he, plaintiff, received a severe shock in his whole system and particularly in his left side, hip, knee, and ankle, which were severely bruised and wounded, and also had two of his front teeth entirely knocked out and lost, and was for a long time confined to his bed, sick, and unable to attend to his business." There were further statements in regard to the permanent character of the alleged injuries, etc., which need no particular or further notice. The company in its answer admitted its existence as a corporation and denied all other allegations of the petition, and pleaded that if the plaintiff had received

any injuries they resulted from his own negligence. There was a reply for the plaintiff, and of the issues joined a trial in which the jury returned a verdict favorable to plaintiff, and judgment was subsequently rendered on the verdict. The company prosecuted error proceedings to this court.

It appears that on March 25, 1886, the plaintiff purchased a ticket at Omaha which entitled him to be transported to Blair by the Chicago, St. Paul, Minneapolis & Omaha Railway Company and thence to Emmet by the defendant company, and pursuant to the purpose for which he had purchased the ticket, became a passenger to Blair on a train of the first named company and to Emmet by a train operated on the line of the defendant company. On the same day the plaintiff delivered to the Wells-Fargo Express Company, at Omaha, two "stands" or "hives" of bees, which were billed to Atkinson, a station on the defendant's line of road, beyond and further distant than Emmet, when considered relatively to Blair as the initial point. The bees were consigned to S. Bowers, Emmet, Nebraska, were so marked as to destination and forwarded on the same train as that on which plaintiff was a passenger. Emmet, though styled a station, had no depot; there was no agent for either the express or railway company, and no facilities for receiving express or freight matter, either from trains or for shipment. The following testimony was given by "the general superintendent of the central department of Wells, Fargo & Co.'s express:"

Q. What is the practice of the express company where there is no agent at depots to deliver express goods to?

A. The practice is, if the train stops where we have no agent, and the owner of the goods calls for them, to hand them out to him. If there is no one there to receive them, we leave them at the next office, to be called for by the owner. * * *

Q. What is the express company's practice where the shipper of express goods is on the train with them?

A. The practice is to deliver the goods at the point to which they are addressed, provided the train stops there and the owner of the goods calls for them if the train stops long enough for us to hand the goods out.   *   *   *

Q. What is done with goods that are carried by or left before if the owner is with them, and he does not receive them and they are not delivered?

A. We usually take them to our office next to the destination of the goods, and generally notify the owner at the place the goods are marked to, that we hold them subject to his order.

As we have before stated, there was no agent for the railroad or express company at Emmet; therefore the delivery of the hives of bees shipped by plaintiff was to be governed, so far as we are informed in this case, by the rule stated in the evidence of the superintendent, from which we have just given quotations. The plaintiff testified: "After we had passed O'Neill, Mr. Hoops, the conductor, came into the car, or passed through the car, and wanted to know if I had some express on, and I said I had, and he said I had better go and look after it or take care of it,—words to that effect." This is emphatically denied by the conductor, who also states that he did not know, prior to the time of arrival at Emmet, or afterwards, until his attention was called to it in such manner as we shall see hereinafter, that there was any express matter to be delivered to plaintiff, or indeed to any other person, at Emmet. Plaintiff testified that he went into the express car immediately after the talk with the conductor, and while in there the train stopped at Emmet and one hive of bees was taken from the car and placed on the station platform; that some delay was occasioned through the inability of the agent in charge of the express to return to plaintiff the proper amount in change after deducting the express charges on the bees from the amount of a ten-dollar bill proffered by plaintiff in payment; that the conductor became impatient and called from the platform that he could not wait; that at, or

prior to this time, the train had been put in motion.
Plaintiff states that he was then standing in the doorway
inside of the car and thought to get out, but discovered
that the part of the train in which he was situated had
passed the platform, and that he had concluded to stay in
the car; that just then the conductor ran up opposite to
the car door, grabbed plaintiff's foot and leg and jerked
him from the car, and in his consequent fall to the ground
the injuries complained of were sustained. It was of
the evidence that the end door of the express car was
so closed that plaintiff could not possibly have entered
the car while in motion, and further, several witnesses
gave testimony to the effect that plaintiff did not go into
the express car before the train stopped at Emmet, but
stepped from the train, when it stopped, to the platform
and walked forward to the express car. The testimony
of the news agent, who was on the train the day plaintiff
claimed to have been injured, was to the effect that
plaintiff came into the baggage car before the train
reached Emmet and asked the baggageman for his hives
of bees, and was told that perhaps they were in the ex-
press car; that plaintiff remained in the baggage car
until the train stopped at Emmet, where he alighted from
the car. This is corroborated by the baggageman in his
testimony. That plaintiff walked along the platform
until he reached the side door of the express car, which
he entered. While he and the express messenger were
transacting the business in regard to the hives of bees,
the train was started. The messenger called to the con-
ductor that there was some express matter to be put off
and the train was stopped again. After some conver-
sation, in which the plaintiff, the express messenger,
and the conductor were all participants, the conductor
gave the signal to go ahead and the train was put in
motion. The conductor testified that when he had gone
a very short distance he discovered the plaintiff sitting
in the doorway of the car and apparently about to jump
therefrom; that he, the conductor, immediately ran up in

front of the door, put up his hands and caught plaintiff under the arms and assisted him to the ground. The testimony of the conductor in regard to how the plaintiff got out of the car, was corroborated by the testimony of four or five other witnesses, including the express messenger, who further states that he got hold of plaintiff's shoulders and assisted in steadying his descent to the ground. The petition in this case was evidently framed upon the theory that the plaintiff, at the time he alleged he was injured, was a passenger of the defendant company, and that it then owed him the duty, which by law devolves upon a carrier of passengers,—and in the several steps of the trial this feature was prominent,—but we think the allegations of the petition were of such a nature that under them a recovery of damages could be had for any injuries proved to have been sustained, if such injuries were occasioned by the unwarranted or negligent acts of the conductor or other employes of defendant company at a time when the plaintiff had ceased to be or was not a passenger, but lawfully on the company's grounds or premises, to attend to some business matter, or in a car where he had a right to be for business purposes, or on the grounds, or in the car as a trespasser.

The evidence which we have hereinbefore quoted in regard to a conversation between the plaintiff and the conductor was objected to and a motion was made to strike out the answer for the reason that it was incompetent, irrelevant, and immaterial, and it had not been shown that it was of the duties of the conductor, or that he, as conductor, had any authority to exercise any supervision over the express company's business, or give any directions in respect to it. It is argued that the trial court erred in not sustaining the motion to strike this evidence from the record, or erred in not excluding it from the consideration of the jury. The only assignment in the petition in error which can be claimed to have any reference to this alleged error, is the general one of "errors of law occurring at the trial duly excepted to at the time,"

which is, in a motion for new trial, sufficient to raise the question of error in either the admission or exclusion of testimony, but is not so in a petition in error. In the latter the assignments must be specific, and must particularly designate the testimony in respect to which it is complained the error occurred; hence the point argued was not sufficiently presented by the record and cannot be considered.

It is contended for the company that the plaintiff had no right to be in the express car; that by going in such car he placed himself in a position of danger which should prevent his recovery in this case. In the course of the argument on this point counsel cite *Union P. R. Co. v. Sue,* 25 Neb., 772, and quote from pages 779 and 780 thereof as follows: "That passengers have no right to enter the baggage car, and that the law will not protect them in so doing, is a well established law of this country (*Pennsylvania R. Co. v. Langdon,* 92 Pa. St., 21; *Houston & T. C. R. Co. v. Clemmons,* 55 Tex., 88; *Kentucky C. R. Co. v. Thomas,* 79 Ky., 160)," and claims what is undoubtedly true, that the same rule is applicable in respect to what is commonly designated "the express car;" but that a passenger goes into the baggage or express car, affords no defense to an action for injuries received while there, unless the fact of the going or being there entered into the injuries, if any, as an element thereof, as their proximate cause or rendering the passenger more liable to receive such injuries than if in the proper place or car assigned for his accommodation. If the danger or risk of receiving danger was not increased by the position in which the passenger had placed himself, then the fact that he had voluntarily assumed the position affords no matter of defense. (2 Wood, Railroads, note 1, p. 1282, to sec. 304, also text on p. 1290 and note 2 and citations.) It could not be of any avail in an action for injuries received as the result of an assault or unwarranted acts of the conductor, the basis of this action, on the theory of plaintiff and the evidence adduced on this particular point by and for him.

It is argued that the plaintiff had, at the time of the alleged injuries, ceased to be a passenger of the company and it then owed him no duty as a carrier of passengers. This question, in this as it is in most cases, was one of fact, to be determined by the jury, guided by proper instructions from the court, hence it was not the province of the trial judge to settle it, nor need we here, as a matter of law.

Another point argued for the defendant company is: "The act of the conductor, as described by the plaintiff, was willful and malicious and entirely outside of the scope of his authority. Therefore there is no liability on the part of the company." In support of this, attention is called to portions of the evidence in relation to the rights and privileges and duties of the conductor in and about the express car. The general superintendent of the central department of Wells-Fargo & Co.'s express testified as follows in regard to this:

Q. Do any of the train hands have any authority over your express matter on the main line run?

A. They have nothing to do with the express; of course they direct the movements of the car with the balance of the train.

Q. This was so in 1886, I suppose?

A. I was not in charge of our service on the F., E. & M. V. line. I think it was the general rule at that time and to that extent applied to this line at that time. * * *

On cross-examination he stated as follows:

Q. Who does have charge of the train?

A. The conductor.

Q. Does or does not the conductor of the train containing the passenger coaches and express car have absolute and unqualified control of the train while in his charge?

A. Entirely.

And on redirect:

Q. How is it with your express business? Is the messenger supposed to have exclusive charge of that? Have conductors authority to allow strangers or passengers to go into the express car?

A. They have no authority from us to do that under the rules of the express company. Our instructions to messengers are that they must not allow strangers to ride in their car; in fact the instructions read that they must not allow any person to ride in their car without an order from the route agent or the superintendent of the express company.

C. A. Miller, who was the express messenger on the train at the time Root claims to have been injured, testified, and was asked: "Do you allow persons to go into the express car?" To which he answered: "No, sir; there is a strict order against it. In fact one of our men was discharged about that time for permitting a man in there, a friend of his coming to speak with him a few moments at the station."

The conductor stated:

Q. What is your duty with reference to that train?

A. Well I had entire charge of the train, the handling of the train. I had charge of the train so far as the passengers and the handling of the train was concerned. I had no control of the express or mail car. If I saw anyone in the mail car I could not go in there and put them out; all I could do was to ask what they were doing in there from the mail clerk or express messenger, and if I thought they were crooked and did not have transportation I would take it up with our superintendent. I did not have to go in there and exclude them.

From this evidence it is contended it appeared that if any person was discovered by the conductor in the express car, who, in his opinion, was there without right, or riding without a ticket, etc., it was not the duty of the conductor to eject such person from the car; but to report the fact to his superiors would be the sufficient and proper action. It is said in the reply brief filed for defendant company: "No one doubts the right of the conductor to remove a trespasser from any part of the train over which he had control." But it is further stated that as to the inside of the express car he had no control.

To give the evidence on this point the full scope which can fairly be claimed for it is that, if the conductor saw any one in the express car who apparently was 'there without right, he could obtain such information as might be furnished by the express messenger in answer to the queries propounded to him, and if the conclusion was reached that the party was probably wrongfully appropriating a free ride, report such act to the proper officers of the company. But the facts and circumstances under which the plaintiff appeared in the express car were not such as to present him to the conductor, as one who was probably "stealing a ride," or attempting to do so, and to call for the application of the rule of conduct sought to be established by the evidence, to which we have just alluded,—i. e., not to molest him, but make a report to the superintendent. All the conditions under which plaintiff was occupying the express car were known to the conductor at the time of the occurrence on the alleged result of which this action was predicated. That this was true will be best shown by what was stated in regard thereto by the conductor, who said: "I had three passengers to get off there; a lady was one, Mr. Root was one, and I don't remember who the other one was. The lady was back in the car next to the sleeper. As the train was coming into the station I came from the rear end and was walking through, and about two seconds after the train came to a stop I went out the forward end of the smoking car onto the smoking car steps and stepped onto the station platform. As I did so I saw Mr. Root on the station platform walking toward the engine going west. I wondered then how he got there, because I did not see him while I was walking through the smoking car, and I made up my mind he must have gone out and been standing on the coach steps while the train was pulling into the station. I thought no more of it. I turned my back on him and looked toward the rear end of the train to see the other two get off. I saw the man get off and saw the brakeman help the lady

off.  I turned to the baggageman and asked him if everything was all right, and he said 'Yes,' and I called, 'All aboard!' and gave the engineer the signal to go ahead, and they started.  Just as the train started,—just as soon as the express messenger felt the motion of the train,—he came to the express car door and said: 'Hold on, Hoops, I've got some express to put off here.'  I was then standing on the station platform and the train had already started.  I said 'whoap.'  Someone pulled the cord.  There are two cords in the train.  One leads to the signal bell in the engine, and the other to the brakes; by pulling one the engineer would set the brakes, but the other would apply the brakes itself.  I don't know who stopped the train, but the train stopped and it had at that time run about a coach length, just about, or probably a trifle more.  However, it run far enough so that the express car, being ahead of the baggage car, had gone beyond the station platform, and I ran down the station platform steps and went up to the express car door, and I says: 'Miller, why didn't you put that express off when we first stopped?'  As I said that I looked into the car and saw Mr. Root standing over on the north side of the car.  This happened on the south side.  He was standing on the north side.  He must have stood within a foot and a half or two feet, at the outside, from the north side of the car, inside.  He was facing east and the express messenger was facing west.  Root was right near the express company's safe.  Miller says: 'This gentleman has got some express on here and he has got a ten-dollar bill and I can't change it, can you?'  With that I hit both pockets and saw that I did not have silver enough to change it, and I said 'No.'  I then said to Mr. Root: 'This train stopped twenty-five minutes at Norfolk for dinner.  You had lots of time, Mr. Root, to attend to this at Norfolk.  Now, sir, when you want your bees you will get them at Atkinson.'  Do you remember that, Mr. Root?  (Mr. Root: 'No, sir.')  Witness: I said, 'Come, get out.'  He said: 'No, I want my bee hives.'  The train was late, and I had

been trying to make up time all day. I gave the signal to the engineer a second time and he started. Just as soon as Mr. Root felt the motion of the train he said: 'Hold on, I want to get out.'" This discloses that the conductor knew, before he took any action, all the whys and the wherefores of the presence of plaintiff in the door of the express car and fully realized all the circumstances attendant thereon, and that it was something which was an interference with his proper control and management of his train, liable to delay the train, which, as he says, "was late," "and I had been trying to make up time all day," and that he concluded that it was a matter within his duties, requiring and demanding his attention and action, and in this conclusion we think he was correct. What he did, and the results, were questions for the determination of the jurors. We are satisfied that there was evidence to sustain a finding that he was acting at the time within the scope of his duties and for the company as conductor of the train. The foregoing would be equally pertinent and applicable irrespective of whether plaintiff, at the time directly involved, was still a passenger or had ceased to be one.

Objections are specifically alleged in an amended petition in error, of the giving of several paragraphs of the charge to the jury, prepared and read by the court on its own motion, and some of the objections were urged in the argument. In the motion for a new trial the exceptions to the series of consecutively stated and numbered propositions embodied in such charge of the trial court to the jury were assigned in gross, and where the record in this particular is as indicated, and it is ascertained that one or more of the propositions or paragraphs contains a correct statement, which we discover is true in this case, no further examination of the alleged errors need be made, hence the arguments in relation to this branch of the case must be overruled. (*Denise v. City of Omaha*, 49 Neb., 750.)

It is claimed that the trial court should not have given

the first, second, and third instructions prepared and presented in behalf of the plaintiff in this suit. In the paragraph of the motion for a new trial, in reference to these instructions, they were not specifically and separately designated, but were grouped, and, as contended by attorney for plaintiff, if either is without error the assignment must be overruled as to all. (*Spears v. Chicago, B. & Q. R. Co.,* 43 Neb., 720; *Omaha Street R. Co. v. Cameron,* 43 Neb., 297.) The first of these instructions was in the following language: "You are instructed, as a general rule, a passenger who has paid his fare to a certain railroad station is entitled to be delivered at that station and is entitled to the rights of a passenger until he has left the company's depot grounds or has a reasonable time so to do, and the fact that he may have gone into the express car of the company's train, for a lawful temporary purpose, would not authorize an employe of the railroad company to lay hands violently on such passenger and forcibly remove him from such car." The vice which it is claimed attached to this instruction is that it assumes as proven some of the disputed facts, viz.: "That plaintiff went into the car for a lawful purpose; and further, that he was violently and forcibly removed." In this we cannot agree with counsel. As we read the instruction attacked, it contains a statement of an abstract proposition without reference in terms to this particular case or any of its facts, but applicable to some phases of the evidence introduced, and, when viewed and considered in connection with the other instructions given in relation to the facts designated in the argument as disputed, we can discover no impropriety in its giving, nor can we feel convinced that it was, when thus contemplated, calculated to either confuse or mislead the jury, hence it must be approved. This being determined, the complaints of this assignment need not be further examined.

It is insisted that the verdict was not sustained by the evidence. We have carefully read and scanned the evi-

62

~dence and must conclude that, although directly conflicting, there was evidence to submit to the jury on the points at issue and sufficient to support the verdict rendered.

The verdict, in amount $1,500, was returned March 10, 1892, the motion for a new trial was overruled of date November 16, 1893, and judgment was then rendered for the amount of the verdict and interest thereon from its date to the date of judgment, in the aggregate $1,676.75. It is claimed that the amount of the judgment should not have exceeded that of the verdict; that the court erred in allowing and including in the judgment the interest as we have before stated. The delay in the rendition of judgment was caused by the filing and pendency of the defendant's motion for a new trial, and it was but just and right that the plaintiff was in the judgment accorded interest on the verdict from its date to the time of judgment. In the case of *Griffith v. Baltimore & O. R. Co.*, 44 Fed. Rep., 574, an action for damages against the company for injury alleged to have been received at a crossing by collision of a train of the company with a buggy in which the plaintiff was riding, the question of the allowance of interest on the amount of the verdict where judgment was delayed by the pendency of the defendant's motion for a new trial, it was said: "I have conferred with the circuit judge upon this question, and the conclusions in which we concur are as follows: That it is proper to allow interest on the verdict from the date of its rendition up to the entry of judgment. And there also appears the following quotation from *Gunther v. Insurance Co.*, 10 Fed. Rep., 830: 'The item of interest on the judgment from the day of the rendition of the verdict to the day of entry of the judgment, amounting to some $500, may be allowed. The delay was caused by a stay of proceedings during the pendency of a motion for new trial. This delay should not be at the plaintiff's expense. The payment of interest meanwhile may properly be deemed a condition attached to the stay, or, if not,

an entry of the judgment, as of the date of entering the
motion for new trial, might, if necessary to avoid dam-
ages to the plaintiff, be permitted.'" In *Gibson v. Cin-
cinnati Enquirer Co.*, 5 Cent. Law J., 446, in the United
States circuit court, southern district of Ohio, wherein
a similar question was considered and determined, it was
held: "Where a verdict is rendered in favor of the plaint-
iff, judgment upon which is delayed by the filing of a
motion for a new trial by the defendant, upon the over-
ruling of the motion the plaintiff in entitled to judgment
for the amount of the verdict, with interest from the
date of its rendition." "The rule applies as well to ac-
tions of tort as to those upon contracts." And there
appears this statement: "Upon the question of the right
of the plaintiff to interest upon the verdict, I can see no
difference between a verdict in an action for a tort and
a verdict in actions sounding in contract. The verdict
in either case fixed the amount due at the time of its ren-
dition, and that amount the party is entitled to have paid
him as of that date, and if the payment is delayed by the
act of the defendant, he ought to have interest. Such
has been the practice of this court and such seems to be
the current of authority." (See, also, citations in this and
the case of *Griffith v. Baltimore & O. R. Co.*, *supra; Ather-
ton v. Fowler*, 46 Cal., 320; *Shephard v. Brenton*, 20 Ia., 41.)
We conclude that there was no error in the allowance
of interest on the verdict during the time the rendition of
judgment was delayed by the pendency of the motion for
new trial. It follows that the judgment of the district
court will be

AFFIRMED.